IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA19-421

Filed: 5 May 2020

Wake County, No. 16JA15

IN THE MATTER OF: J.M.

Appeal by Respondent Mother from order entered 16 January 2019 by Judge Monica M. Bousman in Wake County District Court.  Heard in the Court of Appeals 18 February 2020.

*Assistant County Attorney Julia B. Southwick for Petitioner-Appellee Wake County Human Services.*

*Christopher M. Watford for Respondent-Appellant Mother.*

*Battle, Winslow, Scott & Wiley, PA, by M. Greg Crumpler, and Senior Deputy County Attorney Roger A. Askew for guardian ad litem.*

INMAN, Judge.

Respondent Jessica Hayes ("Mother") appeals the district court's permanency planning order, pursuant to N.C. Gen. Stat. § 7B-1001(a)(4), placing guardianship of her infant daughter Jane[1] with foster parents.[2]  Mother contends the trial court erred in: (1) waiving further review hearings; (2) finding that she was an unfit parent; (3) failing to make an evidentiary finding that the foster parents understood the legal

---

[1] We employ pseudonyms to preserve the anonymity of the juveniles.
[2] Jane's father does not appeal.

significance of their appointment as guardians of Jane; and (4) ceasing reunification efforts without first making the necessary findings of fact.

After careful review, we hold that the trial court properly waived further review hearings, found that Mother is an unfit parent, and verified that Jane's foster parents understood their appointment as guardians. But we vacate the trial court's order and remand for the trial court to make the necessary findings in ceasing reunification efforts.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The record reflects the following facts:

On 15 January 2016, Wake County Human Services ("WCHS") filed a juvenile petition alleging Mother was neglecting her four young children, nine-year old Damon, four-year old Joanne, two-year old Jake, and six-month old Jane. WCHS had been involved with Mother and the children for the last two years by that time. In December 2014, Mother created a safety plan that stemmed from instances of domestic violence between her and the father of the three younger children ("Father"). In May 2015, safety agreements were created to prevent Father and the maternal grandfather from contacting the children due to reported instances of sexual abuse.

In early January 2016, a report indicated that Father had been seen around Mother's home with the children despite the safety plans being in place. Mother resided at her sister's residence for a short time and lived in a hotel before Father

eventually located her and the children and stole her car and phone. Although Mother was able to retrieve her stolen property, Father severely assaulted her, causing her to file a police report for domestic violence. Mother and the children subsequently became homeless days before WCHS filed its juvenile petition. The children were then placed in non-secure custody with WCHS the day of the petition.

On 28 March 2016, the court adjudicated all four children neglected and kept non-secure custody with WCHS. WCHS placed Joanne and Jake in a licensed foster home together, while another foster family cared for Jane. Damon has mental health issues and was placed in a psychiatric hospital. The trial court ordered Mother to comply with a family services agreement, consisting of: obtaining and maintaining sufficient housing; maintaining adequate employment; submitting to a parenting evaluation and attending parenting classes; submitting to a domestic violence evaluation and participating in counseling; regularly notifying the social worker of any change in circumstances; and following the visitation agreement. Mother was allowed to visit the children once per week for one hour.

Over the next two years, the trial court continually attempted to reunify the children with Mother, with adoption being a secondary option. The trial court found that Mother, in 2016, informed Damon that his father died without consulting his therapist and posted a video on Facebook of her engaging in a fight, while she was pregnant, with another pregnant woman. Mother received an unrelated court

settlement and, instead of paying child support, bought a vehicle and vacationed in the Bahamas. Mother also bought shoes for the children but did not allow them to keep them, telling them "that the sneakers would be for when they 'came home.' "

Despite these shortcomings, the trial court also found that Mother actively participated in her case plan, maintained housing, regularly visited the children, gained employment, and progressed in her parenting skills.

Mother gave birth to her fifth child, Danielle, in November 2016, which limited the hours she worked.[3] Beginning in July 2017, Mother transitioned from supervised to unsupervised and overnight visits with Joanne, Jake, and Jane.

However, by the fifth review hearing, on 29 January 2018, more than two years after WCHS' juvenile petition, the trial court still had concerns about Mother's ability to successfully parent her children. Mother had regressed to supervised visits because she unsatisfactorily cared for the children without a parenting coach or social worker present. Joanne told WCHS that she saw Mother hit Jake on the head with a broom, but Mother denied the act ever occurred.[4] Mother told the children that they were coming home soon, that their foster parents did not love them, and that the foster parents cared for the children because they were being paid. The trial court changed the primary plan to adoption and ordered reunification as a secondary plan.

---

[3] WCHS did not petition for custody of Danielle, who has a different father.

[4] Harnett County screened the report and concluded that "there was no indication that it occurred by any other way than accidental means, and there were no injuries." In a later review hearing, Mother testified it was an accident.

In November 2017, despite having her electricity turned off because she said she could not pay the bill, Mother hosted a first birthday party for Danielle at an amusement park and "assist[ed] her sister with her new born baby." Mother still failed to acknowledge that Damon—who had recently been moved to a group home—suffered from mental illness and needed extensive treatment. Mother refused to allow the children's guardian *ad litem* to enter her residence and observe her visits with them.

Following the sixth review hearing in July 2018, the trial court kept in place the permanent plan of adoption with a secondary plan of reunification. The trial court noted that Mother "continue[d] to require significant monitoring during her visits with the children" and was "failing to provide appropriate supervision for all of the children when the visits occur in her home." Although Mother claimed she was earning $477 a week, she failed to provide proof of income. Mother admitted that "many individuals" help care for Danielle because "she doesn't have a consistent person to provide care for her." Mother had reached the maximum amount of sessions with a parenting coach available to her. At one point, Mother visited Damon unannounced and falsely claimed that she had approval to be there.

By December 2018, nearly three years after the four children were removed from Mother's home, and despite protracted juvenile proceedings and supervision, WCHS observed that Mother continued to need supervision and re-direction when

visiting the children and frequently exhibited poor decision-making skills. By that time, Jane had developed a significant attachment to her foster parents and often secluded herself when visiting Mother and her siblings.

On 16 January 2019, following another review hearing, the trial court awarded guardianship of Jane to her foster parents and waived further review hearings.[5]

Mother appeals.

## II. ANALYSIS

### A. *Waiving Review Hearings*

Mother first argues that the trial court erroneously waived future review hearings because the evidence was insufficient to support the court's necessary findings. We disagree.

In juvenile proceedings, the trial court must conduct review hearings every six months or earlier "to review the progress made in finalizing the permanent plan for the juvenile, or if necessary, to make a new permanent plan for the juvenile." N.C. Gen. Stat. § 7B-906.1(a) (2017). The trial court may waive future review hearings if it "finds by clear, cogent, and convincing evidence each of the following":

> (1) The juvenile has resided in the placement for a period
> of at least one year.
> (2) The placement is stable and continuation of the
> placement is in the juvenile's best interests.
> (3) Neither the juvenile's best interests nor the rights of
> any party require that review hearings be held every six

---

[5] The record does not disclose the updated statuses of Mother's remaining children in WCHS custody.

months.
(4) All parties are aware that the matter may be brought before the court for review at any time by the filing of a motion for review or on the court's own motion.
(5) The court order has designated the relative or other suitable person as the juvenile's permanent custodian or guardian of the person.

*Id.* §§ 7B-906.1(n)(1)-(5). The trial court cannot "waive or refuse to conduct a review hearing if a party files a motion seeking the review." *Id.* § 7B-906.1(n).

Mother concedes that the trial court made the statutory findings of fact, but contends that no evidence supports some of those findings. Finding 21 provides that "[n]either the best interests . . . of any party require that review hearings be held every six (6) months." The social worker for WCHS, Christina Dillahunt ("Dillahunt"), testified at the most recent review hearing that, over the past three years since WCHS obtained non-secure custody, Mother has been unable to adequately care for the children without additional supervision and proper direction. Dillahunt testified, for example, that Mother routinely made poor decisions while monitoring the children, including feeding the children large amounts of sugary food, despite their needing significant dental work; attempted to show Jane a graphic picture of Mother's sister's vehicle crash; and asked Jane, then age three, to watch Danielle while she attended to another child. Mother does not contest the finding that "it does not appear likely that either parent will be in a position to safely parent [Jane] with the next six (6) months." We hold this evidence provides, clear, cogent,

and convincing support for the factors required by Section 7B-906.1(n) and the trial court's waiver of future six-month review hearings.

Finding 22 states that "[a]ll of the parties are aware that the matter may be reviewed upon motion for review of any party." The hearing transcript reveals that the trial court informed the parties and their counsel who were present that "the matter may be brought before the Court for review at any time by filing a motion for review or on the court's own motion." Thus, the transcript establishes that the parties were aware that the matter could be reviewed upon a motion by any party, notwithstanding the trial court's waiver of further periodic review hearings.

## B. *Fitness as a Parent*

Mother next argues that the trial court's finding that she was unfit as a parent was not supported by the evidence and violated her constitutional right as a parent. We disagree.

"A natural parent's constitutionally protected paramount interest in the companionship, custody, care, and control of his or her child is a counterpart of the parental responsibilities the parent has assumed and is based on a presumption that he or she will act in the best interest of the child." *Price v. Howard*, 346 N.C. 68, 79, 484 S.E.2d 528, 534 (1997) (citations omitted). However, "the parent may no longer enjoy a paramount status if his or her conduct is inconsistent with this presumption

or if he or she fails to shoulder the responsibilities that are attendant to rearing a child." *Id.*

"[A] natural parent may lose his constitutionally protected right to the control of his children in one of two ways: (1) by a finding of unfitness of the natural parent, or (2) where the natural parent's conduct is inconsistent with his or her constitutionally protected status." *David N. v. Jason N.*, 359 N.C. 303, 307, 608 S.E.2d 751, 753 (2005). "Unfitness, neglect, and abandonment clearly constitute conduct inconsistent with the protected status parents may enjoy." *Price*, 346 N.C. at 79, 484 S.E.2d at 534. "Therefore, the trial court must clearly address whether [the parent] is unfit as a parent or if her conduct has been inconsistent with her constitutionally protected status as a parent, should the trial court . . . consider granting custody or guardianship to a nonparent." *In re J.L.*, __ N.C. App. __, __, 826 S.E.2d 258, 266 (2019) (quotation marks, citations, and alterations omitted); *see also In re D.A.*, 258 N.C. App. 247, 250, 811 S.E.2d 729, 732 (2018) (requiring the trial court "to find that the parents were either unfit or had acted inconsistently with their constitutionally protected status as parents").

At the end of the hearing, the trial court made an oral finding from the bench that "both parents are still unfit and have acted in a manner inconsistent with their constitutionally protected right as a parent." In its written order, the trial court found

that "[b]oth parents are acting inconsistently with the health and safety of the child and are unfit to have custody of the child."

A trial court's finding that a parent is unfit will be affirmed on appeal if we conclude that the finding is supported by clear and convincing evidence. *See, e.g.*, *Adams v. Tessener*, 354 N.C. 57, 66, 550 S.E.2d 499, 505 (2001) (concluding, to affirm the trial court's award of custody to grandparents, that "the evidence of record constitutes clear and convincing proof that [the parent's] conduct was inconsistent with his right to custody of the child").

The trial court made the following pertinent findings of fact:

> 6. The mother has not been able to adequately demonstrate the ability to parent the child. She continues to require significant monitoring during her visits with the children. She continues to fail to demonstrate the ability to safely parent the children without the intervention of the social worker. The mother has allowed the children to spend a great deal of time during the visits playing games on the mother's cell phone. The mother's behavior in visits was consistent with the mother failing to provide consistent and appropriate supervision for the child and her siblings when the visits occurred in her home. The mother may have completed the services which have been ordered over the nearly three (3) year period the child has been in custody but has not sufficiently demonstrated a change in her approach to parenting such that the child would be safe and have her needs met in the mother's care. . . .
>
> 11. Neither parent has been able to demonstrate an ability to safely care for the child such that the Court would be able to approve unsupervised visitation. The mother was awarded unsupervised visits at one time but was unable to

maintain that level due to an incident in which an older sibling was hit in the forehead with a broom handle by the mother. . . .

19. The return of the child to [Mother's custody] would be contrary to the child's health and safety.

Dillahunt, the social worker responsible for monitoring Mother's contact with the children, testified as follows:

- Over a period of nearly three years, Mother consistently exhibited concerning behavior when caring for and visiting Jane and the other children.

- Mother hit Jake on the forehead with a broomstick.

- Mother frequently lost track of the children when they visited and needed redirection to effectively manage the children's behaviors and how to speak with them.

- When the children visited with Mother, she directed them to sit and watch television extensively, and allowed Jane, not yet four years old, to "spend[] excessive amount[s] of time on [Mother's] phone playing video games."

In light of the above evidence, we hold that the trial court did not err in determining that Mother was unfit to parent Jane.

To the extent Mother argues that her positive actions toward reunification were not given sufficient weight by the trial court, we emphasize that "[i]t is not the

function of this Court to reweigh the evidence on appeal." *In re T.H. & M.H.*, __ N.C. App. __, __, 832 S.E.2d 162, 166 (2019) (quotations marks and citation omitted).

Although Mother argues that other findings of fact are unsupported by sufficient evidence, we need not address this argument, because the findings we have already concluded are supported by clear and convincing evidence are sufficient to support the trial court's ultimate finding that Mother is unfit to parent Jane. *See, e.g.*, *In re P.T.W.*, 250 N.C. App. 589, 602, 794 S.E.2d 843, 852 (2016) (citation omitted).

### C. *Verification of Guardianship*

Mother asserts that the trial court awarded guardianship to Jane's foster parents without making an evidentiary finding that they understood the legal significance of their appointment. We hold that the trial court performed its statutory duty.

Before a trial court can appoint a guardian, it must "verify that the person being appointed as guardian of the juvenile understands the legal significance of the appointment and will have adequate resources to care appropriately for the juvenile." N.C. Gen. Stat. § 7B-600(c) (2017); *see also* N.C. Gen. Stat. § 7B-906.1(j) (2017). The trial court does not need to "make any specific findings in order to make the verification." *In re J.E.*, 182 N.C. App. 612, 616-17, 643 S.E.2d 70, 73 (2007). "It is sufficient that the court receives and considers evidence that the guardians

understand the legal significance of the guardianship." *In re L.M.*, 238 N.C. App. 345,

347, 767 S.E.2d 430, 432 (2014) (citation omitted).

Here, the foster parents testified at the hearing as to the following:

> [Trial Court]. Do you understand that, as the guardian, you would be—you would have the care, custody, and control of the child or could arrange a suitable placement for the child? Do you understand that?
>
> [Foster Father]. Yes.
>
> [Trial Court]. Do you understand that you would represent the child in legal actions before the Court?
>
> [Foster Father]. Yes.
>
> [Trial Court]. Do you understand—I'm not saying you would, but do you understand you could consent to marriage, enlisting in the armed forces, or enrollment in school?
>
> [Foster Father]. Yes.
>
> [Trial Court]. Do you understand that you could also consent to any necessary remedial, psychological, medical, or surgical treatment for the child?
>
> [Foster Father]. Yes.
>
> [Trial Court]. Do you understand that your authority as guardian shall continue until guardianship is terminated by a court order, until the child is emancipated pursuant to a certain legal action or until she reached the age of majority?
>
> [Foster Father]. Yes.
>
> [Trial Court]. Do you understand that the Court would only

terminate the guardianship if the Court found that the relationship between you and the child was no longer in the child's best interest, you became unfit, that you neglected your duties as guardian, or that you were unwilling or unable to continue assuming the guardian's duties?

[Foster Father]. Yes.

[Trial Court]. And are you willing and able to become a guardian?

[Foster Father]. Yes.

[Trial Court]. Are you willing to follow the Court's order regarding visitation with the parents?

[Foster Father]. Yes.

[Trial Court]. Are you willing to either—depending on what the Court would decide at some point, supervise or monitor the visitation or arrange for pick-up and drop-off if it ever became unsupervised that either you would do it, your wife would do it, or you would have someone that you designated do it?

[Foster Father]. Yes.

[Trial Court]. You are willing to accommodate that?

[Foster Father]. Yes, we will.

. . . .

[Direct Examination]. Okay. And did you hear everything your—

[Foster Mother]. I did.

[Direct Examination]. —husband testified to?  And do you agree with all of that?

[Foster Mother]. Completely, yes.

[Direct Examination]. Do you understand the same things that the Judge has asked him, as far as your obligations?

[Foster Mother]. I do.

[Direct Examination]. And are you also willing to -- willing and able to provide for this child as her guardian?

[Foster Mother]. Completely, yes.

[Direct Examination]. Okay. And do you and your husband both care for her?

[Foster Mother]. Completely.

[Direct Examination]. Do you have—what type of emotions do you have with connection to her?

[Foster Mother]. A little too much.

[Direct Examination]. Okay. And you consider her as part of your family?

[Foster Mother]. Yes. . . .

[Cross Examination]. Will you provide a safe and loving home for her until she reaches the age of majority?

[Foster Mother]. Easily, yes.

[Cross Examination]. And meet all of her needs?

[Foster Mother]. Yes.

Dillahunt, the social worker, also testified that the foster parents understood their responsibilities as guardians and indicated their "desire to have [Jane] treated

exactly as their biological children."

In its order, the trial court found that the foster parents "are committed to providing for the child for the remainder of her minority and beyond" and "are willing to become parties to this action." The above evidence and findings show that the trial court performed its duty under Section 7B-600(c) in verifying that Jane's foster parents understood the legal significance of their appointment as guardians. We need not review whether the trial court verified that the foster parents have the financial resources to care for Jane, as Mother does not argue that on appeal.

### D. *Reunification Efforts*

Mother finally argues that the trial court did not make all of the required findings of fact before ceasing reunification efforts. We agree and vacate the trial court's guardianship order and remand for the trial court to make the necessary findings.

"This Court reviews an order that ceases reunification efforts to determine whether the trial court made appropriate findings, whether the findings are based upon credible evidence, whether the findings of fact support the trial court's conclusions, and whether the trial court abused its discretion with respect to disposition." *In re C.M.*, 183 N.C. App. 207, 213, 644 S.E.2d 588, 594 (2007) (citations omitted).

A trial court may cease reunification efforts following any permanency planning hearing if it "makes written findings that reunification efforts clearly would be unsuccessful or would be inconsistent with the juvenile's health or safety." N.C. Gen. Stat. § 7B-906.2(b) (2017). In determining that efforts would be unsuccessful or contrary to the juvenile's well-being, the court must make written findings "demonstrat[ing] lack of success" as to each of the following:

> (1) Whether the parent is making adequate progress within a reasonable period of time under the plan.
>
> (2) Whether the parent is actively participating in or cooperating with the plan, the department, and the guardian ad litem for the juvenile.
>
> (3) Whether the parent remains available to the court, the department, and the guardian ad litem for the juvenile.
>
> (4) Whether the parent is acting in a manner inconsistent with the health or safety of the juvenile.

*Id.* § 7B-906.2(d).

Here, the trial court made limited findings relating only to portions of the factors listed above. The guardian *ad litem* concedes that the trial court made no finding regarding whether Mother demonstrated a lack of success in participating or cooperating with WCHS and the guardian *ad litem* or whether she has remained available to the court, WCHS, or the guardian *ad litem*.

Because "the trial court failed to make the requisite findings required to cease reunification efforts" under Section 7B-906.2(d), *In re D.A.*, 258 N.C. App. at 254, 811

S.E.2d at 734, we vacate the trial court's order and remand for it to make those findings. Although Mother also argues that the trial court's findings were not supported by credible evidence, we will not review that argument as we already determined its findings are deficient.

### III. CONCLUSION

We affirm the trial court's decision to waive further review hearings and hold that it properly found Mother is an unfit parent and that it performed its statutory duty in verifying that Jane's foster parents understood the legal significance of their appointment as guardians. We vacate and remand the trial court's guardianship order for it to make the required statutory findings before ceasing reunification efforts.

AFFIRMED IN PART; VACATED IN PART AND REMANDED.

Judges STROUD and YOUNG concur.